IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE GAYNOR JR., in his capacity | ) | |
| as personal representative of the Estate | ) | |
| of Lavern N. Gaynor and trustee of the | ) | |
| Lavern N. Gaynor Revocable Trust | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

The United States complains and alleges as follows:

1.      Plaintiff, the United States, brings this lawsuit to collect civil penalties assessed against Lavern N. Gaynor ("Decedent") based on her willful failure to report, pursuant to 31 U.S.C. § 5314 and its implementing regulations, her financial interest in and/or signature authority over foreign bank accounts during 2009, 2010, and 2011.

2.      The United States seeks to collect the penalties primarily from the Estate of Lavern N. Gaynor and secondarily, to the extent the estate is unable to fully pay the penalties, from the Lavern N. Gaynor Revocable Trust.

3.      A delegate of the Secretary of the Treasury of the United States referred this case to the Department of Justice in accordance with 31 U.S.C. § 3711(g)(4)(C). This action is commenced at the direction of the Attorney General of the United States.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and 1395(a) because Decedent resided in Naples, FL, which is within this district, until her death in April 2021 and because the penalties accrued in this district.

## DEFENDANT

6.      Lavern N. Gaynor died on April 12, 2021. Her son, George Gaynor Jr. ("Gaynor Jr."), is named as the sole Defendant.

7.      Gaynor Jr. is named in his capacity as the personal representative of the Estate of Lavern N. Gaynor and the trustee of the Lavern N. Gaynor Revocable Trust.

8.      Decedent settled the Lavern N. Gaynor Revocable Trust in August 1996. It has since been amended at least 10 times. The tenth amendment was in October 2016.

9.      Gaynor Jr. resides in Chicago, IL.

2

OBLIGATION TO REPORT INTEREST IN FOREIGN ACCOUNTS

10.     Federal law requires every resident or citizen of the United States who has a "financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country" to report that relationship annually to the Department of the Treasury. 31 C.F.R. § 1010.350(a) (2012).

11.     To fulfill this requirement, a person must file a form commonly known as an FBAR. At the time of the FBAR violations alleged in this complaint, the form was called Form TD-F 90-22.1, and it was due by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. §§ 1010.350(a), 1010.306(c) (2012).

12.     Any person who fails to report an interest in a foreign account may be subject to a civil penalty assessed by the Department of the Treasury. For violations involving the willful failure to report the existence of a foreign account, the maximum penalty that may be assessed is the greater of $100,000 or 50 percent of the balance in the foreign account at the time of the violation. 31 U.S.C. § 5321(a)(5)(C).

DECEDENT'S WILLFUL FAILURE TO FILE FBARS

*A. Decedent inherited her late husband's Swiss bank account*

13.     Decedent was a U.S. citizen from her birth until the time of her death.

14.   In 1902, Decedent's grandfather, John Gates, was a founder of the oil and gas company currently known as Texaco.

15.   Decedent was the heiress to a portion of the Texaco oil fortune.

16.   In 2000, Decedent's late husband, George Gaynor Sr. ("Gaynor Sr."), opened an account at Cantrade Privatbank AG in Switzerland.

17.   The account was in the name of Gery Trading Corporation, a Panamanian entity controlled by Gaynor Sr.

18.   Gery Trading Corporation appointed a Swiss trust company, Centrapriv Zurich AG, as its representative to "transact any and all business" with the bank.

19.   In 2003, Cantrade Privatbank AG merged into Ehinger & Armand von Ernst, and the account moved to Ehinger & Armand von Ernst.

20.   In 2005, Julius Baer acquired Ehinger & Armand von Ernst, and the account moved to Julius Baer.

21.   In connection with the opening of the account, Gery Trading Corporation executed two contradictory documents in 2000. The first is a Form W-8BEN that falsely certifies, for IRS reporting purposes, that the beneficial owner of the account was Gery Trading Corporation. The Form W-8BEN lists a Panamanian address for Gery Trading Corporation. The second is a Swiss bank Form A, which

accurately reflects that Gaynor Sr. was the beneficial owner of the account. The Swiss bank Form A lists a Florida address for Gaynor Sr.

22.     Upon Gaynor Sr.'s death in July 2003, Decedent became the beneficial owner of the Swiss bank account.

23.     Decedent's beneficial owner status is reflected on a Swiss bank Form A executed by Centrapriv Zurich AG in October 2003. The form lists Decedent as the beneficial owner, provides a Florida address for her, and notes that her nationality is "U.S.A."

24.     Ehinger & Armand von Ernst had a qualified intermediary agreement with the IRS that imposed certain documentation requirements on the bank regarding accounts held by U.S. persons.

25.     To circumvent those requirements, representatives of Gery Trading Corporation and Centrapriv Zurich AG executed under penalty of perjury a "Certification of Beneficial Owner and Non-US Person Status" in December 2004. The document refers to the qualified intermediary agreement with the IRS and contains a certification from Gery Trading Corporation that it was the beneficial owner and that it is not a U.S. person.

26.     As reflected by the information on the Swiss bank Form A correctly identifying Decedent as the beneficial owner, the December 2004 certification under penalty of perjury was false.

### B. *Decedent repeatedly met with Swiss bankers*

27.     Decedent was intimately familiar with her Swiss bank and its

employees.

28.     For instance, in 2004, Decedent personally agreed to make SPB

Partners AG the external asset manager for the Ehinger & Armand von Ernst

account. Decedent told Ehinger & Armand von Ernst that she selected that

arrangement as a favor to Beat Pfenniger, a banker she liked who worked at

SPB Partners AG.

29.      Shortly after Decedent provided these instructions to Ehinger &

Armand von Ernst during an in-person meeting, Gery Trading Corporation sent a

letter to Ehinger & Armand von Ernst to effectuate the arrangement with SPB

Partners AG. The letter asked Ehinger & Armand von Ernst to send SPB Partners

AG "a copy of our bank opening forms (without Form A)."

30.     The Form A that Gery Trading Corporation asked Ehinger & Armand

von Ernst to exclude is the one that revealed Decedent's beneficial ownership of

the account.

31.     Decedent also had a "personal relationship" with another Swiss

banker, Sascha Balsiger, according to an internal memorandum from Ehinger &

Armand von Ernst. In February 2006, Decedent's son, Gaynor Jr., visited the bank,

which by that time had been acquired by Julius Baer. During the visit, Gaynor Jr.

"pointed out that he talked to his mother and that she did not want to give up the personal relationship towards Sascha Balsiger, as she liked him and appreciated his professional attitude very much." Gaynor Jr. added that "his whole family has always been very committed to the bank." Gaynor Jr. advised one of the bankers to "contact and see his mother next time I am in the US."

32.    Decedent's familiarity with—and involvement in the management of—her offshore assets is further evidenced by meetings she had with Swiss bankers.

33.    On at least three occasions, Decedent personally met with Swiss bankers who visited her in Florida. The contents of two of these meetings are described in memoranda prepared by the bankers.

34.    In October 2004, bankers from Ehinger & Armand von Ernst visited Decedent at her home in Naples. The bankers and Decedent "had a general discussion of advantages/disadvantages of centralized/decentralized portfolio management, respectively." During this meeting, Decedent gave the instruction referenced above to have SPB Partners AG be the asset manager for the account. Afterward, Decedent had lunch with the Swiss bankers and took them on a tour of the location where she was building a new home.

35.    In June 2005, Decedent once again received a visit in Florida from Ehinger & Armand von Ernst. The following occurred during the visit:

A. A Swiss banker explained to Decedent that his role "was to play the 'banker', thus monitoring [the] regulatory and financial environment and assess[ing] possible impacts on our clients, advising them on new financial products (e.g. traveller cheque card, investment products etc.) and assisting her when it comes down to money transfers, payment instructions etc."

B. The banker explained that Pfenniger and SPB Partners AG were the ones who would "comment on the performance" of her portfolio. The banker described the relationship between Decedent, Ehinger & Armand von Ernst, and SPB Partners AG as "triangular."

C. Decedent told the banker that when Pfenniger retired, she would "certainly give the management part" back to Ehinger & Armand von Ernst and that "she's looking forward to building a longstanding relationship with [the banker]."

D. Decedent advised the banker to talk to her son, Gaynor Jr., "as he has been taking over family office tasks over time."

E. The banker noted that "some questions were answered (total exposure to foreign currencies, hedging activities etc.)."

F. The banker gave Decedent a brochure about investment topics.

36. During the June 2005 visit, Decedent also signed paperwork related to her Swiss bank account. For instance:

A. Decedent signed a document related to "Derivatives Trading and Forward Transactions" in which she stated that she was "fully acquainted with the functional aspects of derivative financial instruments and the markets on which these are traded . . . ."

B. Decedent signed a "Declaration of agreement for naming the accountholder for foreign payment transaction." This document allowed for certain disclosures to "foreign recipient bank[s] . . . in the event of payments abroad."

C. Decedent signed a document pertaining to "Payment and Delivery Instructions by Telephone or by Fax." In doing so, she agreed, with emphasis in the original, that "**payments as well as deliveries of securities may be made by the Bank upon instructions given by telephone or by fax**."

37. In February 2006, a Swiss banker contacted Decedent by phone and also visited her in Florida.

38. Visits like the ones that Decedent received were shrouded in secrecy. For instance, "Julius Baer relationship managers traveling to the United States

were . . . advised to take certain steps to avoid scrutiny from U.S. authorities . . . ."

These steps were laid out in a March 2006 memo. Examples include:

A. "When asked by [a Customs] Officer what you will do while in the USA, say Business and of course some leisure, trying to make some time to enjoy your beautiful country. Proud government employees usually love this type of statement. One can throw in skydiving or another fun sport/activity. This tends to shift the questioning away from the business purpose to the 'fun time' part of the trip (carrying a tennis racket also puts the emphasis on 'fun and games', and not on business)."

B. "Do not bring laptop, or other electric devices which hold client data (absolutely nothing). One travels more like in the old days (no cell phone with saved client phone numbers)."

C. "Only use Mobile phone registered in and operating from Switzerland. Avoid phone calls from Hotel to clients. It is recommended to purchase a telephone calling card from the post office, grocery stores or electronic shops. This allows you to use practically any phone with no specific link left behind. The best way is to pay for the calling card in cash. For ex: a 400 minutes local calling card costs less than $50,

but the rates can vary. Most cards can also be used to call anywhere

abroad."

*See United States v. Bank Julius Baer & Co. Ltd.*, No. 1:16-cv-886, ECF No. 1-2 at

32–34 (S.D.N.Y. Feb. 4, 2016) (hereinafter *Julius Baer DPA*).

39.     In addition to the in-person meetings, Decedent also communicated

with the bank by mail on at least one occasion.

40.     In January 2006, Decedent sent a postcard informing the bank of her

new address. The postcard said: "I have a new address and want to share it with

friends like you!"

41.     Although Decedent was directly involved with the assets, she held

them through a nominee, Gery Trading Corporation. Using foreign entities as

nominal beneficial owners was a common practice to circumvent qualified

intermediary agreements.

42.     Julius Baer ultimately admitted in connection with a deferred

prosecution agreement that "[i]n an effort to avoid triggering Julius Baer's

obligations under the [qualified intermediary agreement] to report to the IRS

accounts held by U.S. taxpayer-clients who held U.S. securities in their undeclared

accounts, Julius Baer allowed and facilitated U.S. clients with undeclared accounts

at Julius Baer to open accounts nominally held by sham structures formed under

the laws of other countries such as Liechtenstein and the British Virgin Islands."

*Julius Baer DPA*, ECF No. 1-2 at 29–30.

### C. *Decedent moved her assets to other Swiss banks to avoid tax compliance*

43.     In September 2009, in connection with the IRS's efforts to crack down on undisclosed Swiss bank accounts with U.S. beneficial owners, Julius Baer wrote a letter to Gery Trading Corporation stating that the entity had not provided the bank with a Form W-9, which the bank would use to report information about the account to the IRS. The bank wrote: "We therefore kindly request you to provide us with the respective form or other proof of U.S. tax compliance by the end of September 2009. . . . Please be informed that we have decided to discontinue any account relationships for which we have not received proper documentation of U.S. tax compliance by the end of September 2009."

44.     In that same letter, Julius Baer referenced a potential obligation to disclose the account to the IRS and highlighted an IRS program for voluntarily disclosing past violations of that obligation in exchange for limitations on penalties. The bank wrote: "In case of doubt regarding your U.S. tax return filing or other disclosure obligations with respect to your assets deposited with our bank, you may wish to consult with your U.S. tax advisor to determine whether you have any additional obligations. In this respect we would like to draw your attention to the Voluntary Disclosure Program of the Internal Revenue Service (IRS)."

45.     Decedent did not provide proof of compliance with U.S. tax obligations by the requested deadline.

46.     In October 2009, Julius Baer wrote another letter to Gery Trading Corporation. The bank wrote: "As we have not yet received [the requested] proof of U.S. tax compliance we decided to discontinue the existing account relationship with you . . . ."

47.     Instead of coming into compliance by disclosing the offshore account to the IRS, Decedent moved the funds to a different Swiss bank.

48.     On November 25, 2009, Centrapriv, on behalf of Gery Trading Corporation, directed Julius Baer to transfer all assets to an account at Banque Louis in Switzerland. The Banque Louis account was in the name of Gery Trading Corporation.

49.     In 2011, Decedent once again moved the assets to another Swiss bank.

50.     From Banque Louis, the funds went to an account at Bank Frey in the name of Gery Trading Corporation.

### D. Decedent hid the offshore accounts from her CPA

51.     Taxpayers who receive interest or ordinary dividends from or who have certain defined relationships with foreign bank accounts or trusts must include Schedule B along with their Form 1040 income tax returns. Schedule B

13

asks about the existence of foreign accounts. It also expressly references the FBAR filing requirement and asks whether the taxpayer is obligated to submit an FBAR.

52.     For all or substantially all of the time that Decedent had an interest in foreign accounts between tax years 2003 and 2011, Decedent used Malcolm Davis, a CPA in Naples, FL, to prepare her federal income tax returns.

53.     Decedent personally met with Davis in connection with the preparation of each federal income tax return.

54.     In connection with the preparation of the returns, Decedent disclosed to Davis her taxable income from domestic sources.

55.     Decedent did not disclose to Davis her interest in foreign accounts. Nor did she provide Davis with any documents related to those accounts.

56.     For each tax year between 2009 and 2011, Decedent's return, which she submitted under penalty of perjury, included a Schedule B that disclosed certain income from domestic sources. Each year, however, Decedent checked "no" when asked about whether she had a financial interest in or signature authority over a foreign account.

E. *Decedent failed to file timely FBARs*

57.     Decedent also failed to file timely FBARs.

58.     In each year between 2009 and 2011, Decedent's account balance at her foreign banks remained well above $10,000.

14

59.     Decedent's self-reported high balance in the Julius Baer account in 2009 was $31,420,132.

60.     Decedent transferred the Julius Baer funds to Banque Louis in 2009, and her self-reported high balance in the Banque Louis account in 2009 was $32,963,695.

61.     Decedent had a financial interest in the Julius Baer and Banque Louis accounts in 2009.

62.     On or before June 30, 2010, Decedent was required to file an FBAR reporting her financial interest in the Julius Baer and Banque Louis accounts in 2009.

63.     Decedent failed to file a timely FBAR for calendar year 2009.

64.     Decedent's self-reported high balance in the Banque Louis account in 2010 was $32,316,069.

65.     Decedent had a financial interest in the Banque Louis account in 2010.

66.     On or before June 30, 2011, Decedent was required to file an FBAR reporting her financial interest in the Banque Louis account in 2010.

67.     Decedent failed to file a timely FBAR for calendar year 2010.

68.     Decedent's self-reported high balance in the Banque Louis account in 2011 was $32,616,069.

69.     Decedent transferred the Banque Louis funds to Bank Frey in 2011, and her self-reported high balance in the Bank Frey account in 2011 was $30,904,723.

70.     Decedent had a financial interest in the Banque Louis and Bank Frey accounts in 2011.

71.     On or before June 30, 2012, Decedent was required to file an FBAR reporting her financial interest in the Banque Louis and Bank Frey accounts in 2011.

72.     Decedent failed to file a timely FBAR for calendar year 2011.

73.     The self-reported balances listed above are from Decedent's "quiet disclosure," which is detailed below.

### F. Decedent belatedly made a "quiet disclosure"

74.     In November 2012, Decedent filed amended federal income tax returns for tax years 2009 and 2010 to belatedly disclose her offshore assets and the associated taxable income.

75.     In November 2013, Decedent filed an amended federal income tax return for tax year 2011 to belatedly disclose her offshore assets and the associated taxable income.

76.     On November 22, 2013, Decedent filed belated FBARs for calendar years 2009 through 2011.

16

77.    The amended tax returns and delinquent FBARs were prepared by Steven Kraft, an accountant based in Switzerland.

78.    As Julius Baer explained in its September 2009 letter to Gery Trading Corporation, there were formal procedures for self-reporting undisclosed bank accounts to the IRS in exchange for limitations on penalties.

79.    Decedent did not follow those procedures when amending her tax returns or filing the delinquent FBARs. Instead, she made what is referred to as a "quiet disclosure" by submitting the returns and FBARs without alerting the IRS to her violations.

80.    The apparent purpose of the "quiet disclosure" was to exploit the possibility that the IRS might not notice the filings and therefore might not assess penalties.

81.    A "quiet disclosure" is not a legally effective way of self-reporting, and the IRS cautioned as far back as 2009 that "taxpayers electing to file a 'quiet disclosure' should be aware of the risk of being examined and potentially criminally prosecuted for all applicable years." *Norman v. United States*, 138 Fed. Cl. 189, 192 (2018) (internal quotation marks omitted).

82.    Decedent's failure to timely report the existence of her foreign accounts coincided with a failure to report taxable income from those accounts.

83.     Decedent's amended tax year 2009 return belatedly reported $564,914 in foreign interest income from Julius Baer and $153,159 in foreign dividend income from Julius Baer.

84.     Decedent's amended tax year 2010 return belatedly reported $628,343 in foreign interest income from Banque Louis, $168,433 in foreign dividend income from Banque Louis, and a net capital gain of $168,136.

85.     Decedent's amended tax year 2011 return belatedly reported $451,616 in foreign interest income from Banque Louis and Bank Frey, $170,945 in foreign dividend income from Banque Louis and Bank Frey, and a net capital gain of $4,251,933.

86.     The three amended returns collectively reported more than $1 million in additional taxes due.

### G. Decedent attempted to deceive the IRS during its audit

87.     The quiet disclosure did not bring an end to Decedent's deception. Instead, during the audit that followed the disclosure, Decedent actively misled the IRS on several occasions in an effort to convince the IRS not to assess penalties.

88.     In a May 2017 interview, Decedent told the IRS that she did not know of the existence of her offshore accounts until the time that she amended her tax returns.

89.    In a written statement to the IRS in November 2017, Decedent claimed that even as of that date, she knew "very little about the foreign account in question."

90.    In a June 2018 filing with the IRS, Decedent asserted through her attorney that she "knew nothing about Gery or its foreign bank accounts" until 2012. She contended, with emphasis in the original, that her "lack of knowledge" was both "obvious and easily provable."

91.    Decedent's evasive actions, coupled with the express warning provided by Julius Baer about U.S. tax compliance, demonstrate that Decedent knew of or recklessly disregarded the requirement to disclose her offshore accounts. Moreover, Decedent's inaccurate Schedule B filings demonstrate that she had constructive knowledge of the requirement.

92.    Decedent's actions—including, but not limited to, submitting false answers on Schedule B, using a Panamanian entity as her nominee, failing to inform her tax return preparer of the foreign accounts, underreporting her income, closing the Julius Baer account instead of providing proof of compliance with U.S. tax obligations, continuing to hide assets offshore at Banque Louis and Bank Frey, and attempting to mislead the IRS—indicate willfulness in her failure to timely file FBARs.

COUNT I: JUDGMENT FOR WILLFUL FBAR PENALTIES FOR 2009, 2010,
AND 2011
(Defendant: George Gaynor Jr. in his capacity as personal representative of the
Estate of Lavern N. Gaynor)

93.     The United States incorporates by reference paragraphs 1–92.

94.     The statute of limitations for assessment of an FBAR penalty is six

years from the date the FBAR was due. 31 U.S.C. § 5321(b)(1). However,

Decedent agreed to extend the time for assessing penalties for the 2009, 2010, and

2011 calendar years to June 30, 2019.

95.     The IRS can make separate assessments for each account for each

calendar year. Pursuant to 31 U.S.C. § 5321(a)(5)(C), the maximum assessment

per account per calendar year is the greater of $100,000 or 50 percent of the

balance of the account at the time of the violation.

96.     The IRS determined that the statutory maximum penalty for Decedent

for calendar years 2009, 2010, and 2011 was in excess of $48 million.

97.     As a matter of policy, however, when the IRS is examining more than

one year and the same assets went unreported in multiple years, the IRS will

typically avoid penalizing the same assets multiple times and will instead

determine a penalty amount that is allocated among the years at issue.

98.     Along those lines, the IRS determined a penalty amount of

$17,299,139 in this case.

99.     The IRS allocated $5,691,899 to calendar year 2009, $6,076,373 to calendar year 2010, and $5,530,867 to calendar year 2011.

100.    On May 30, 2019, a delegate of the Secretary of the Treasury assessed civil penalties against Decedent pursuant to 31 U.S.C. § 5321(a)(5)(C) based on her willful failure to file an FBAR for calendar years 2009, 2010, and 2011. The assessments were in the amounts reflected in ¶ 99, *supra*.

101.    A Delegate of the Secretary of the Treasury gave notice to Decedent of the unpaid penalties. Despite notice and demand for payment, Decedent failed and refused to pay the entire amount of the penalties.

102.    The unpaid assessed amounts have accrued interest and other additions, including penalties pursuant to 31 U.S.C. § 3717 for failure to pay a lawful debt owed to the United States.

103.    Decedent's estate is liable for the unpaid assessed civil penalties, interest, and failure to pay penalties.

104.    As of May 1, 2020, the unpaid FBAR penalties, failure to pay penalties, and interest for calendar years 2009, 2010, and 2011 total $18,417,184.73.

105.    The Court should enter judgment in that amount in favor of the United States and against Gaynor Jr. as personal representative of the Estate of Lavern N. Gaynor.

COUNT II: SUPPLEMENTAL JUDGMENT FOR WILLFUL FBAR
PENALTIES FOR 2009, 2010, AND 2011
(Defendant: George Gaynor Jr. in his capacity as trustee of the Lavern N. Gaynor
Revocable Trust)

106.   The United States incorporates by reference paragraphs 1–105.

107.   Pursuant to Florida Statute § 733.707(3), the Lavern N. Gaynor

Revocable Trust is liable for the unpaid assessed penalties to the extent that the

Estate of Lavern N. Gaynor is unable to pay them.

108.   Pursuant to Federal Rule of Civil Procedure 69 and Florida Statute

§ 733.707(3), the Court should enter a supplemental judgment against Gaynor Jr.

as trustee of the Lavern N. Gaynor Revocable Trust to the extent that the Estate of

Lavern N. Gaynor is unable to pay the judgment entered against it.

WHEREFORE, Plaintiff, the United States, prays for the following relief:

A.     That, with respect to Count I, the Court enter judgment in favor of the

United States and against George Gaynor Jr., in his capacity as personal

representative of the Estate of Lavern N. Gaynor, in the amount of $18,417,184.73

as of May 1, 2020, plus interest and further additions thereafter as provided by law,

for FBAR penalties for calendar years 2009, 2010, and 2011;

B.     That, with respect to Count II, the Courter enter a supplemental

judgment in favor of the United States and against George Gaynor Jr., in his

capacity as trustee of the Lavern N. Gaynor Revocable Trust, stating that the

United States may collect any unpaid balance of the judgment from the Lavern N. Gaynor Revocable Trust;

      C.    That the United States have such other and further relief, including costs, as the Court may deem just and proper.

Date: May 14, 2021

                    Respectfully submitted,

                    DAVID A. HUBBERT
                    Acting Assistant Attorney General

            By:

                    */s/ Robert S. Silverblatt*
                    ROBERT S. SILVERBLATT
                    Virginia Bar Number 85506
                    Trial Attorney, Tax Division
                    U.S. Department of Justice
                    Post Office Box 14198
                    Ben Franklin Station
                    Washington, D.C. 20044
                    Telephone: (202) 514-8682
                    Facsimile:  (202) 514-9868
                    Robert.S.Silverblatt@usdoj.gov

                    *Of Counsel*

                    KARIN HOPPMANN
                    Acting United States Attorney