UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

                                        Case No.: 2:21-cv-382-JLB-KCD

GEORGE N. GAYNOR, in his capacity
as personal representative of the Estate
of Lavern N. Gaynor and trustee of the
Lavern N. Gaynor Revocable Trust,

     Defendant.

_____/

## **ORDER**

The United States of America ("Plaintiff" or the "Government") brings this action against George N. Gaynor, in his capacity as personal representative of the Estate of Lavern N. Gaynor and trustee of the Lavern N. Gaynor Revocable Trust to collect civil penalties assessed against his mother, Lavern N. Gaynor, based on her failure to disclose a foreign bank account in violation of the Bank Secrecy Act, 31 U.S.C. §§ 5314 and 5321.  Currently before the Court is the Government's Motion for Partial Summary Judgment.  (Doc. 51).  For the reasons discussed below, the Motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

A.    <u>Factual Background</u>

Starting in 2000, Gery Trading, a Panamanian corporation, held a bank account located in Switzerland, first at Cantrade Privatebank (each iteration of this

account is colloquially referred to as the "Swiss Account").  (Doc. 51-3 at 8).  The Swiss Account was held at Julius Baer through 2009.  (Doc. 51 at 5; Doc. 54 at 2; Doc. 51-2 at ¶¶ 53–55).  After that, the Swiss Account was moved from Julius Baer to Banque Louis.  (Doc. 51 at 5; Doc. 54 at 2; Doc. 51-2 at ¶¶ 53–55).  Finally, the Swiss Account was moved from Banque Louis to Bank Frey.  (Doc. 51 at 5; Doc. 54 at 2; Doc. 51-2 at ¶¶ 56–61).

After George H. Gaynor passed away in July 2003, his wife, Lavern Gaynor, was the sole beneficial owner of the Swiss Account.  (Doc. 51-2 at ¶¶ 9, 40).  Mr. and Mrs. Gaynor were married for more than 40 years.  (Doc. 51-2 at ¶ 10).  Mrs. Gaynor was a United States citizen during 2009, 2010, and 2011, and she passed away in 2021.  (Doc. 51-2 at ¶¶ 1–4; Doc. 54-3 at 9).  Her son, George N. Gaynor, is named as Defendant in his capacity as the personal representative of the Estate of Lavern N. Gaynor and the trustee of the Lavern N. Gaynor Revocable Trust.  (Doc. 51 at 3; Doc. 54 at 2).  For calendar years 2009 through 2011, the Swiss Account held an aggregate balance of at least $10,000.  (Doc. 51 at 5; Doc. 54 at 2; Doc. 51-2 at ¶¶ 44, 46, 48).

There are some minor disputes about the high balances in the Swiss Account for the relevant years.  Plaintiff states that for 2009, the high balance in the Swiss Account was equivalent to $31,839,730 in U.S. currency despite the fact that its calculations show a $33,067,885 balance for that year in the Julius Baer account.  (Doc. 51 at 5; Doc. 54 at 2; Doc. 51-4 at 2; *see also* Doc. 51-2 at ¶ 45).  Defendant does not seem to disagree with the $31,839,730 number.  (Doc. 54 at 2).  For 2010,

Plaintiff's calculations show that the high balance in the Swiss Account was equivalent to $34,598,277 in U.S. currency, but Defendant avers that the high balance was actually $32,316,069.  (Doc. 51 at 5–6; Doc. 54 at 2; Doc. 54-1 at 1; Doc. 51-2 at ¶ 47; Doc. 51-4 at 2).  Finally, for 2011, Plaintiff claims that the high balance in the Swiss Account was equivalent to $30,922,833 in U.S. currency (although its calculations show that the high balance in the Banque Louis account was $34,598,277), but Defendant claims that the high balance in the Banque Louis accounts was $32,616,069 and the high balance in the Bank Frey account was $30,904,723.  (Doc. 51 at 6; Doc. 54 at 2; Doc. 51-4 at 2; Doc. 54-2 at 2; *compare with* Doc. 51-2 at ¶ 49 (admitting that the high balance in the Swiss Account in calendar year 2011 was $32,616,069)).

Ultimately, the parties agree that Mrs. Gaynor was required to file a report of foreign bank and financial accounts ("FBAR"), reporting her financial interest in the Swiss Account for each year from 2009 through 2011 on June 30, 2010, June 30, 2011, and June 30, 2012.  (Doc. 51 at 6; Doc. 54 at 2; Doc. 53 at 1; Doc. 54-3 at 9).  And the parties also agree that she failed to timely file the FBARs for those years.  (Doc. 51 at 6; Doc. 54 at 2; Doc. 53 at 1; Doc. 54-3 at 9).  The IRS assessed the following penalties against Mrs. Gaynor: $5,691,899 for the 2009 tax period (consisting of a $100,000 penalty for the Julius Baer balance and a $5,591,899 penalty for the Banque Louis balance); $6,076,373 for the 2010 tax period; and $5,530,867 for the 2011 tax period (consisting of a $100,000 penalty for the Banque

Louis balance and $5,430,867 for the Bank Frey balance).  (Doc. 54-3 at 1; Doc. 51-4).

B.   <u>Procedural Background</u>

The Government filed its Complaint on May 14, 2021.  (Doc. 1).  Defendant filed his Answer on July 12, 2021.  (Doc. 8).  An Amended Complaint was filed on July 29, 2021 (Doc. 18) and an Answer to the Amended Complaint was filed on August 12, 2021 (Doc. 19).  On September 10, 2021, the Government filed a Reply to Defendant's counterclaim.  (Doc. 29).

On November 3, 2022, the Government filed its Motion for Partial Summary Judgment (Doc. 51) (the "Motion").  On November 22, 2022, the parties filed a Joint Stipulation, stipulating that Mrs. Gaynor was required to file FBAR forms on June 30, 2010, June 30, 2011, and June 30, 2012, but that the forms were not timely filed.  (Doc. 53).  Defendant filed a response to the Motion on November 22, 2022.  (Doc. 54).  Plaintiff filed a reply in support of its Motion on December 6, 2022.  (Doc. 55).  On February 2, 2023, Defendant filed a Notice of Supplemental Authority in support of his response.  (Doc. 58).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A district court must grant a motion for summary judgment only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

4

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" if a rational trier of fact, viewing all of the record evidence, could find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tennessee Land Consultants, LLC*, 631 F. App'x 817, 820 (11th Cir. 2015).

## DISCUSSION

I.   <u>Whether Mrs. Gaynor was required to and failed to file FBAR forms.</u>

Under 31 U.S.C. § 5314(a) of the Bank Secrecy Act of 1970, the Secretary of the Treasury (the "Secretary") requires U.S. citizens "to keep records, file reports, or keep records and file reports," when they "make[] a transaction or maintain[] a relation for any person with a foreign financial agency." The implementing regulation for this statute provides:

> Each United States person having a financial interest in, or signature or other authority over, a bank . . . or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a

5

> reporting form prescribed under 31 U.S.C. [§] 5314 to be
> filed by such persons.

31 C.F.R. § 1010.350(a).[1]  A United States person subject to this requirement in

2011 was required to submit Form TD-F 90-22.1 (the "FBAR"), but the regulation

applies to any successor form.  31 C.F.R. § 1010.350(a).

Under 31 U.S.C. § 5321, the Secretary may impose a civil penalty of up to

$10,000.  31 U.S.C. § 5321(a)(5)(B)(i).  But no penalty can be imposed if the violation

was "due to reasonable cause" and "the amount of the transaction or the balance in

the account at the time of the transaction was properly reported."  31 U.S.C.

§ 5321(a)(5)(B)(ii).  And when a person "willfully" fails to report the existence of an

account, the maximum penalty is increased to the *greater* of: (i) $100,000 or (ii) 50%

of the amount of the balance in the account at the time of the violation.  31 U.S.C.

§§ 5321(a)(5)(C)(i); 5321(a)(5)(D)(ii).  Under 31 C.F.R. § 1010.306, a report required

by § 1010.350 shall be filed "on or before June 30 of each calendar year." 31 C.F.R.

§ 1010.306(c).[2]

---

[1] 31 C.F.R. § 1010.350 is the amended and recodified version of 31 C.F.R. § 103.24 and 31 C.F.R. § 103.27, which were effective during part of the relevant time period, but only until February 28, 2011.  31 C.F.R. § 103.24 stated, in relevant part: "Each person subject to the jurisdiction of the United States . . . having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship to the Commissioner of the Internal Revenue for each year in which such relationship exists, and shall provide such information as shall be specified in reporting form prescribed by the Secretary to be filed by such persons."  31 C.F.R. § 103.24(a).

[2] 31 C.F.R. § 103.27, which was in effect until February 28, 2011, stated, in relevant part, that "[r]eports required to be filed by § 103.24 shall be filed with the Commissioner of Internal Revenue on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 103.27(c).

The parties agree that Mrs. Gaynor was required to file FBAR forms for Tax Years 2009, 2010, and 2011, due on June 30, 2010, June 30, 2011, and June 30, 2012 respectively.  (Doc. 53 at ¶ 1).  The parties also stipulated that the forms were not timely filed and, instead, were filed late in calendar year 2013.  (*Id.* at ¶ 2).

Accordingly, the Court grants the Motion to the extent that it seeks summary judgment as to whether Mrs. Gaynor was required to file FBAR forms for Tax Years 2009, 2010, and 2011, and whether she failed to file those forms timely.  The Government admits that the issue of whether Mrs. Gaynor's violation was willful should be reserved for trial because there are genuine disputes of material fact that preclude summary judgment on that issue.  (Doc. 51 at 13).  Thus, the Court reserves that issue for trial.

II.   <u>Whether the IRS appropriately calculated Mrs. Gaynor's penalty.</u>

The IRS assessed three penalties against Mrs. Gaynor: $5,691,899 for the 2009 tax period (consisting of a $100,000 penalty for the Julius Baer balance and a $5,591,899 penalty for the Banque Louis balance); $6,076,373 for the 2010 tax period; and $5,530,867 for the 2011 tax period (consisting of a $100,000 penalty for the Banque Louis balance and $5,430,867 for the Bank Frey balance).  (Doc. 54-3 at 1; Doc. 51-4 at 4).  Plaintiff claims that the penalty assessment for each year does not come close to the statutory penalty cap (*see* Doc. 51 at 12), but Defendant argues that the IRS miscalculated each of the penalties because it did not use the correct account balances required under the statute (*see* Doc. 54 at 5).

Under 31 U.S.C. § 5321, when a person "willfully" fails to report the existence of an account, the maximum penalty is the greater of: (i) $100,000 or (ii) 50% of the amount of the *balance in the account at the time of the violation*.  31 U.S.C. §§ 5321(a)(5)(C)(i); 5321(a)(5)(D)(ii) (emphasis added).  The Internal Revenue Manual ("IRM") provides that "[i]n determining the statutory maximum penalty amount under 31 USC 5321(a)(5)(c)(i)(II)," examiners should "use the balance for each account as of the violation date, defined in *IRM 4.26.16.5.2*."  IRM 4.26.16.5.5.3(8) (emphasis in original).  And "violation date" for reporting violations for calendar years 2015 and earlier occurs "at the end of the day June 30th of the year following the calendar year for which accounts must be reported."  IRM 4.26.16.5.2(2)a; *see also* IRM 4.26.16.1.6(4) ("Examples of reporting violations include . . . reporting an account on a late-filed FBAR (even if the account information is reported accurately). . . .").

The Government explains that the IRS calculated the penalty "by taking 50% of the maximum balance between 2009 and 2011" and "then allocated the penalty across the three years."  (Doc. 51 at 11).  The Government provided the following chart to illustrate the penalties:

| Year | Julius Baer Balance | Banque Louis Balance | Bank Frey Balance | Assessed Penalty (Total) |
|------|---------------------|----------------------|-------------------|--------------------------|
| 2009 | $33,067,865 | | | $100,000 |
| | | $31,839,730 | | $5,591,899 |
| 2010 | | $34,598,277 | | $6,076,373 |
| 2011 | | $34,598,277 | | $100,000 |
| | | | $30,922,833 | $5,430,867 |
| | | | **TOTAL** | **$17,299,139** |

(*Id.*)  For the assessed penalties greater than $100,000, the penalties each equal

8

about 17.5% of the maximum account balance for each respective year (much less than the 50% statutory cap).  (*See id.* at 12).  The Government avers that while the balance of each account on June 30 of the following year is not available, that does not matter because "[t]he only reasonable inference to be drawn from the maximum balance for each year is that the balance on June 30 was at least twice the assessed penalty."  (*Id.*)  In its reply, the Government further explains that "[t]o conclude that the cap was breached, the Court would have to find that . . . without reason, the account balance shifted more than $20,000,000, *every year*, between June 30 and the year end."  (Doc. 55 at 3).  The Government also points out that "Defendant has offered no evidence to suggest that was the case and inferring that the balance swung so much would not be a reasonable inference to draw in his favor."  (*Id.*).

Defendant argues that summary judgment cannot be granted on this point because the IRS did not use the appropriate following-year June 30 balances for the accounts at issue in making its determination and instead calculated its penalties with reference to the highest aggregate balance.  (Doc. 54 at 5).  In support of his argument, Defendant cites *United States v. Schwarzbaum*, 24 F.4th 1355, 1361 (11th Cir. 2022).

In *Schwarzbaum*, the defendant failed to pay his FBAR penalties, and the district court found that he willfully violated the FBAR reporting requirements.  24 F.4th at 1361.  The district court also concluded that the IRS miscalculated the FBAR penalties by using the highest annual balances in the foreign accounts for each year instead of using the June 30 balances.  *Id.*   The district court there

recalculated and imposed new FBAR penalties against the defendant using the June 30 balances whenever possible. *Id.* The Eleventh Circuit concluded that the district court lacked the power to recalculate the defendant's FBAR penalties because that power belongs to the IRS. *Id.* at 1365 (citing 31 C.F.R. § 1010.810(g) (delegating to the Commissioner of Internal Revenue "the authority to: assess and collect civil penalties under 31 U.S.C. [§] 5321"); *Vidiksis v. EPA*, 612 F.3d 1150, 1154 (11th Cir. 2010) ("Regarding a penalty assessment, an agency's determination is considered to be particularly within the agency's competence.")).

The Eleventh Circuit ruled that "[g]iven the agency's error, the district court should have remanded [the defendant's] FBAR penalties to the IRS for recalculation." *Schwarzbaum*, 24 F.4th at 1365. As the Eleventh Circuit noted, "[r]emand is the appropriate remedy when an administrative agency makes an error of law, for it affords the agency an opportunity to receive and examine the evidence in light of the correct legal principle." *Id.* (quoting *Zhou Hua Zhu v. U.S. Atty' Gen.*, 703 F.3d 1303, 1315 (11th Cir. 2013)) (internal quotation marks omitted). The Eleventh Circuit also ruled that "the district court correctly found [that] the IRS's original penalties were not in accordance with law" because it used the defendant's foreign accounts' highest annual balances instead of their June 30 balances. *Id.* The Eleventh Circuit reasoned that "the fact that the IRS *may* reach a different result when it recalculates [the defendant's] penalties in accordance with the FBAR civil penalty statute and regulations is enough to justify remand." *Id.* at 1366 (emphasis in original) (citation omitted).

The Court agrees with the Government that it seems unlikely that the accounts in question fluctuated by such a large amount each year that the June 30 balances would cause the penalties to exceed the statutory cap, particularly because Defendant asserts that "Mrs. Gaynor had little to no knowledge—let alone any involvement—with the foreign accounts."  (Doc. 54 at 1–2).

For example, based on the numbers used by the Government, the high balance in Banque Louis was $34,598,277 in 2010.  (Doc. 51-4 at 2).  Accordingly, the maximum penalty is $17,299,138.50, a good deal more than the current penalty assessed at $6,076,373 for that year.  (*Id.*)  For the $6,076,373 penalty to exceed the statutory maximum, the amount in Banque Louis on June 30, 2011 would have to be less than $12,152,746 (double the penalty), a $22,445,531 decrease.  That would be particularly odd when the maximum balance in the Banque Louis account in 2011 was also $34,598,277, with the Bank Frey balance in 2011 decreasing to $30,922,833.  (*Id.*)  It would imply that someone was regularly moving roughly $20 million into and out of the Swiss Account.

But neither the Government nor Defendant has provided record evidence about how, whether, or when the money in the Swiss Account was moved or what the balance in the Swiss Account was on June 30 of each year.  Thus, a genuine issue of material fact remains as to the balance on June 30 of each year.  Accordingly, the Government's request for summary judgment on the issue of whether the penalties exceeded the statutory cap is denied.  *See Henderson v. GATX Corp.*, No. 8:09-cv-2312-T-33AEP, 2012 WL 1190971, at *2 (M.D. Fla. Apr. 10, 2012)

("[T]he moving party must demonstrate that the facts underlying all relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the nonmoving party has introduced no evidence whatsoever.").

The Government's request to adjudicate the calculation of the FBAR penalty after the jury's decision on willfulness, which Defendant agreed to, is granted because it is most efficient to first determine whether the penalty was willful and *then* determine whether the penalty was properly calculated.  (*See* Doc. 51 at 22–23; Doc. 54 at 18–19); *see also* Fed. R. Civ. P. 42(b) (explicitly allowing court to order separate trial of one or more separate issues "to expedite and economize").

III.   <u>Whether the FBAR penalties abated upon Mrs. Gaynor's passing.</u>

Defendant's first affirmative defense is that the FBAR penalties abated upon Mrs. Gaynor's passing.  (Doc. 19 at ¶¶ 109–14).  The Government disagrees and moves for summary judgment on this point.  (Doc. 51 at 13–19).

As a preliminary matter, Defendant contends that the Government's motion should be denied and instead, the Court should consider the affirmative defense upon motion for directed verdict or other dispositive motion made by Defendant. (Doc. 54 at 8).  There are no issues of fact preventing the Court from granting summary judgment on this issue, and Defendant does not explain why he believes that the Court should not consider the Government's request for summary judgment on this issue.  *See Silcox v. Hunter*, No. 3:16-cv-1509-J-32MCR, 2018 WL 3633251, at *13 (M.D. Fla. July 31, 2018) ("Partial summary judgment may be used

12

to dispose of affirmative defenses") (citing *Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 944 F. Supp. 886, 891 (M.D. Fla. 1996)); *see also* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim *or defense* . . . on which summary judgment is sought.") (emphasis added).

The Government points out that every court to consider the issue has held that FBAR penalties do not abate on death.  (Doc. 51 at 13).  Defendant concedes this point but maintains that only district courts have considered this issue and the matter "remains a live issue in this and every other circuit."  (Doc. 54 at 8).  Indeed, the Eleventh Circuit has not specifically determined whether an FBAR penalty survives the death of a party.

Generally, "[i]n the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law."  *U.S. v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1994).  The parties have not cited any statutory language or otherwise persuasive source that would reveal the drafters' intent with respect to survivability, and the Court is not aware of any such intent.  Therefore, the Court will evaluate this issue under federal common law.  *See id.* at 137 (where the False Claims Act ("FCA") and its legislative history did not reveal the drafters' intent with respect to survivability, the Court "turn[ed] to federal common law for guidance").

The parties agree that resolution of this issue depends on whether the FBAR penalty is deemed "remedial" or "penal."  (Doc. 51 at 14; Doc. 54 at 9).  "A remedial action is one that compensates an individual for specific harm suffered, while a

penal action imposes damages upon the defendant for a general wrong to the public." *NEC Corp.*, 11 F.3d at 137 (citing *In re Wood*, 643 F.2d 188, 190–91 (5th Cir. 1980)).  While remedial actions survive the death of a party, penal actions do not.  *Id.*; *see also U.S. v. Est. of Schoenfeld*, 344 F. Supp. 3d 1354, 1370 (M.D. Fla. 2018) ("It is well-settled that remedial actions survive the death of a party, while penal actions do not") (citation, alterations, and internal quotation marks omitted).

In determining whether a statute is penal or remedial, courts within the Eleventh Circuit have examined three factors: "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *NEC Corp.*, 11 F.3d at 137 (quoting *Wood*, 643 F.2d at 191) (internal quotation marks omitted).   The court in *United States v. Green*, 457 F. Supp. 3d 1262, 1268–69 (S.D. Fla. 2020), pointed out that the *NEC Corp.* factors were developed with respect to liquidated damages under the Truth in Lending Act to be awarded to an injured consumer.  *Green*, 457 F. Supp. 3d at 1268–69 (citing *Wood*, 643 F.2d at 191).  Accordingly, those factors "draw a distinction[] between whether the wrongs were to an individual or the public and whether the recovery runs to an individual or the public" and thus "do not allow for a situation where the United States itself has suffered a harm because of a defendant's conduct." *Id.* at 1269.  The Court is persuaded by the reasoning in

14

*Green* that the *NEC Corp.* factors, "although instructive, are not on point here because it is the Government itself that has been harmed." *Id.*

The *Green* court and the *Estate of Schoenfeld* court used another framework to analyze this issue, outlined in *Hudson v. United States*, 522 U.S. 93, 99–100 (1997). *See Green*, 457 F. Supp. 3d at 1269–70; *Est. of Schoenfeld*, 344 F. Supp. 3d at 1370. The *Hudson* framework analyzes the question of "whether the scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty" by "(1) asking whether the legislature expressed a preference for labeling the penalizing mechanism as civil or penal, and (2) applying the seven" *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), factors. *Green*, 457 F. Supp. 3d at 1269 (quoting *Hudson*, 522 U.S. at 99–100) (internal quotation marks and alteration omitted). The *Kennedy* factors include:

> (1) "whether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Estate of Schoenfeld*, 344 F. Supp. 3d at 1370 (quoting *Kennedy*, 327 U.S. at 168–69) (alterations omitted). The *Hudson* Court noted that "no one factor should be considered controlling as they 'may often point in differing directions.'" *Hudson*, 522 U.S. at 101. The analysis established by *Hudson* is also not the perfect one for this situation because the issue there was whether a punishment was criminal or

15

civil for the purposes of determining whether a particular penalty ran afoul of the Double Jeopardy Clause. *Id.* at 98–99. The Court finds that the *Hudson* factors are instructive in this case and, moreover, finds that analysis of the *Hudson* factors also proves robust enough to cover the topics set forth in *NEC Corp.* factors. Accordingly, the Court will primarily analyze the *Hudson* factors, with discussion of the *NEC Corp.* factors where appropriate.

     i.    <u>Whether the legislature expressed a preference for labeling the penalizing mechanism as civil or penal.</u>

As set forth in *Estate of Schoenfeld*, Congress "expressly indicate[d] its preference that Section 5321 be regarded as civil by titling the statutory section authorizing the imposition of the sanction as 'Civil Penalties.'" *Estate of Schoenfeld*, 344 F. Supp. 3d at 1370 (citing 31 U.S.C. § 5321; *United States v. Ward*, 448 U.S. 242, 249 (1980) ("'[W]e believe it quite clear that Congress intended to impose a civil penalty upon persons in [defendant's] position' based on Congress's label")). "This intent is further demonstrated by Congress's decision to confer enforcement authority on the Secretary." *Id.*; *see also* 31 U.S.C. § 5321(a)(5)(A) ("The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314."). "'That such authority was conferred upon administrative agencies is *prima facie* evidence that Congress intended to provide for a civil sanction.'" *Est. of Schoenfeld*, 344 F. Supp. 3d at 1370 (quoting *Hudson*, 522 U.S. at 103; citing *Helvering v. Mitchell*, 303 U.S. 391, 402 (1938) (recognizing that "[c]ivil procedure is incompatible with the accepted rules and constitutional guaranties governing the trial of criminal prosecutions" because

16

"the determination of the facts upon which liability is based may be made by an administrative agency instead of a jury" (citation omitted); *Cole v. U.S. Dep't of Agric., A.S.C.S.*, 133 F.3d 803, 806 (11th Cir. 1998)).

ii.     The *Kennedy* factors.

*(1) Whether the sanction involves an affirmative disability or restraint.*

With respect to the first factor, the Court finds that a monetary fine such as the FBAR penalty is not an affirmative disability or restraint. *See Smith v. Doe*, 538 U.S. 84, 89–90, 99–100 (2003) (Alaska Sex Offender Registration Act, which contained a registration requirement and notification system, "impose[d] no physical restraint, and so [did] not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint").

*(2) Whether the sanction has historically been regarded as a punishment.*

As to the second factor, "the Supreme Court has determined that money penalties have not historically been viewed as punishment." *Est. of Schoenfeld*, 344 F. Supp. 3d at 1371 (quoting *Cole*, 133 F.3d at 806); *see also Hudson*, 522 U.S. at 104 ("While petitioners have been prohibited from further participating in the banking industry, this is 'certainly nothing approaching the "infamous punishment" of imprisonment.'") (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)). "Indeed, 'the payment of fixed or variable sums of money is a sanction which has been recognized as enforceable by civil proceedings since the original revenue law of 1789.'" *Est. of Schoenfeld*, 344 F. Supp. 3d at 1371 (quoting *Hudson*, 522 U.S. at 104) (alterations omitted). "This applies equally to monetary tax penalties." *Id.*

17

(citing *Helvering*, 303 U.S. at 401 ("The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation.") (internal quotation marks omitted)).  The Court thus finds that the assessed penalties here have not been historically regarded as punishment.

      *(3) Whether the sanction comes into play only on a finding of scienter.*

Next, with respect to the third factor, the Secretary "may impose a civil money penalty on *any* person who violates, or causes any violation of, any provision of section 5314." 31 U.S.C. § 5321(a)(5)(A) (emphasis added).  Accordingly, the FBAR penalty does not "come into play only on a finding of *scienter*."  *See Hudson*, 522 U.S. at 99–100, 104; *see also Est. of Schoenfeld*, 344 F. Supp. 3d at 1370. Although the penalty is higher for a willful violation, the Supreme Court addressed a similar issue in *Hudson*, stating that "[t]he fact that petitioners' 'good faith' was considered in determining the *amount* of the penalty to be imposed in this case is irrelevant, as we look only to 'the statute on its face' to determine whether a penalty is criminal in nature." *Hudson*, 522 U.S. at 104 (emphasis added).  Here, the statute, on its face, allows for a penalty simply for a violation, and willfulness only comes into play when determining the amount of the penalty.  *See* 31 U.S.C. § 5321(a)(5)(A)–(D).  Accordingly, the sanction does not come into play only on a finding of *scienter*.

      *(4) Whether the sanction's operation will promote the traditional aims*
         *of punishment—retribution and deterrence.*

While the FBAR penalty does seem to promote retribution and deterrence, "all civil penalties have some deterrent effect." *Hudson*, 522 U.S. at 102.  And,

certainly, at least some civil penalties have been found to be remedial. *See, e.g., NEC Corp.*, 11 F.3d at 138 (FCA's *qui tam* provisions are remedial in nature); *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc.*, 32 F.3d 528, 530, 534 (11th Cir. 1994) (describing that the Dealer Protection Act, which allows for damages in an amount equal to three times the pecuniary loss, is remedial in nature). Accordingly, "although the FBAR penalty serves some retributive and deterrent purposes, those purposes do[] not unilaterally render the FBAR penalty penal in nature." *Green*, 457 F. Supp. 3d at 1271.

> *(5) Whether the behavior is already a crime.*

"[T]he Court recognizes that the willful failure to file an FBAR can result in criminal prosecution." *Est. of Schoenfeld*, 344 F. Supp. 3d at 1372 (citing 31 U.S.C. § 5322). The Court agrees with the *Schoenfeld* court that "[n]ot only is Congress's decision to include a separate criminal penalty insufficient to render the money penalty criminally punitive, but it underscores Congress's intention that Section 5321 be regarded as remedial." *Id.* (internal citations, alterations, and quotation marks omitted).

> *(6) Whether an alternative purpose to which the sanction may rationally be connected is assignable for it.*

Next, with respect to the sixth factor, the IRS Report of Foreign Bank & Financial Accounts (FBAR) Reference Guide states that the purpose of the FBAR is "to identify persons who may be using foreign financial accounts to circumvent U.S. law," and to "identify or trace funds used for illicit purposes or to identify unreported income maintained or generated abroad." *See* IRS Report of Foreign

Bank & Financial Accounts (FBAR) Reference Guide at 1,

https://www.irs.gov/pub/irs-pdf/p5569.pdf (last visited Sept. 5, 2023).  The Bank

Secrecy Act Guide also states that the reports filed by owners of foreign bank

accounts "are heavily used by law enforcement agencies, both domestic and

international to identify, detect and deter money laundering whether it is in

furtherance of a criminal enterprise, terrorism, tax evasion or other unlawful

activity."  Internal Revenue Serv., Bank Secrecy Act,

https://www.irs.gov/businesses/small-businesses-self-employed/bank-secrecy-act

(last visited Sept. 5, 2023).

"FBAR violations may deprive the Government of taxes on investment gains

and the Government likely expends significant resources on investigating foreign

accounts."  *Green*, 457 F. Supp. 3d at 1270 (citing *U.S. v. Garrity*, No. 3:15-CV-

243(MPS), 2019 WL 1004584, at *9 (D. Conn. Feb. 28, 2019)).  "Moreover, FBAR

violations may prevent the Government from investigating and prosecuting crimes

and may aid in concealing other misconduct."  *Id.*  (citing *Garrity*, 2019 WL

1004584, at *9).  Accordingly, each of the first two *NEC Corp.* factors (whether the

purpose of the statute was to redress individual wrongs and whether recovery under

the statute runs to the harmed individual [*see NEC Corp.*, 11 F.3d at 137]) also

indicates that the FBAR penalty statute is remedial.

> *(7) Whether the sanction appears excessive in relation to the alternative*
> *purpose assigned.*

Finally, with respect to the final *Kennedy* factor and the final *NEC Corp.*

factor (whether the recovery authorized is wholly disproportionate to the harm

suffered [*NEC Corp.*, 11 F.3d at 137]), the statutory FBAR penalty seems neither excessive nor wholly disproportionate to the harm the Government itself has suffered.  The maximum penalty under 31 U.S.C. § 5321(a)(5)(C) for willfully failing to file an FBAR is the greater of $100,000 or half of the account's balance at the time of the violation.  "[T]he FBAR penalty ties the amount to the balance of the account, which reflects Congress' likely determination that the value of the harm to the Government itself is correlated to the balance of the account."  *Green*, 457 F. Supp. 3d at 1271; *Garrity*, 2019 WL 1004584, at *9 (maximum civil penalty for willfully failing to file an FBAR was "proportional to the harm caused by [defendant's] violation").

For the reasons set forth above, the Court finds that the FBAR penalty for a willful violation is remedial and did not abate upon Mrs. Gaynor's death.  *See Green*, 457 F. Supp. 3d at 1272 ("[T]he FBAR penalty is the proverbial square peg in the round hole; it fits perfectly in neither of the round holes of the remedial-penal dichotomy.  Rather, the FBAR penalty is primarily remedial with incidental penal effects."). The Court also agrees with the *Green* court that "granting a windfall to estates of violators of the FBAR requirements because the violator . . . pass[ed] away after the violation occurred and before the Government filed suit against . . . her for FBAR violations contradicts the remedial purpose of the FBAR filing requirements."  *Id.* (citing *Kirk v. Comm'r of Internal Revenue*, 179 F.2d 619, 622 (1st Cir. 1950)).  Thus, the Court grants summary judgment on this point.

21

IV.   <u>Whether the FBAR penalties are subject to the Eighth Amendment's restriction on excessive fines.</u>

Defendant's second affirmative defense is that the FBAR penalty sought by the Government violates the Eighth Amendment's prohibition on excessive fines. (Doc. 19 at ¶¶ 115–17).  The Government disagrees and seeks summary judgment on this point.  (Doc. 51 at 20–22).  Defendant asks that the Court deny summary judgment, but his arguments rely on case law and, critically, do not set forth any issue of material fact preventing the Court from doing so.  (Doc. 54 at 12–18).

As described above, neither the Government nor Defendant has provided evidence in the record about how, whether, or when the money in the Swiss Account was moved or what the balance in the Swiss Account was on June 30 of each year. (*See supra*, sec. II).  If the Court were to find that the FBAR penalty is a fine subject to the Eighth Amendment (which the Court expressly does not do in this Order), the Court would then have to address whether such fine was excessive.  But the amount of the fine has not been determined.  Accordingly, the Court denies summary judgment on this issue, without prejudice to the Government reasserting this argument after the Court adjudicates the calculation of the FBAR penalty should the jury find willfulness.  *See Schwarzbaum*, 24 F.4th at 1358 n.1 ("Schwarzbaum also argues that his civil penalties were excessive fines under the Eighth Amendment.  Because we direct a remand for recalculation of Schwarzbaum's penalties, we need not reach this issue.").

V.    Whether the calculation of the FBAR penalty should be reviewed under an abuse of discretion standard following the jury's decision.

Defendant's second counterclaim asserts that the IRS has abused its discretion in setting the amount of the FBAR penalty in this case.  (Doc. 19 at ¶ 120).  The Government agrees that the Court should review the amount of the FBAR penalty under the abuse of discretion standard.  (Doc. 51 at 22–23).  But the Government requests that the Court resolve this counterclaim because it "is a defense, and there is no affirmative claim available."  (*Id.* at 23).  Defendant states that he has no objection to the Government's proposal to resolve the counterclaim so long as the Court reviews the amount of the FBAR penalty under an abuse of discretion standard.  (Doc. 54 at 18–19).

The Court has already granted the Government's request to adjudicate the calculation of the FBAR penalty after the jury's decision on willfulness because it is most efficient to first determine whether the penalty was willful and then determine whether the penalty was properly calculated.  (*See supra*, sec. II); *see also Schwarzbaum*, 24 F.4th at 1363–64 (quoting 5 U.S.C. § 706(2)(A)) ("Under the APA, a 'reviewing court shall . . . hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'").

Accordingly, the Court grants the Government's motion for summary judgment on this point, solely to the extent that the Government requests that the Court designate the second counterclaim as an affirmative defense.  *See* Fed. R. Civ. P. 8(c)(2).

## CONCLUSION

For the foregoing reasons, the United States' Motion for Partial Summary Judgment (Doc. 51) is **GRANTED** in part and **DENIED** in part.

**ORDERED** in Fort Myers, Florida on September 6, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

24